William Thomas CAPPARELLA, C–1439

v.

Harold M. BOSLOW, Director, Patuxent
Institution, State of Maryland.

Civ. A. No. 17135.

United States District Court
D. Maryland.

Jan. 23, 1970.

Richard C. Whiteford, Towson, Md.,
for petitioner.

Francis B. Burch, Atty. Gen., and
Bernard L. Silbert, Asst. Atty. Gen. for
the State of Maryland, Baltimore, Md.,
for respondent.

WATKINS, District Judge.

## MEMORANDUM OPINION AND ORDER

Petitioner, presently incarcerated at
Patuxent Institution, sought the issu-
ance of a writ of habeas corpus. From
the petition, and independent investiga-
tion, it was shown that petitioner, repre-
sented by court appointed counsel, plead-
ed not guilty to Indictment No.
2901/1962 and Indictment No. 4612/1962
charging him in various counts with
robbery, assault with intent to rob, as-
sault, petit larceny, burglary and grand
larceny. After a trial before Judge J.
Harold Grady, sitting without a jury
in the Criminal Court of Baltimore, pe-
titioner was found guilty on April 19,
1963 of four counts of Indictment No.
4612/1962 and of two counts of Indict-
ment No. 2901/1962. He was sentenced
to a ten year prison term for Indictment
No. 4612/1962 and a five year term for
Indictment No. 2901/1962—the sentences
to run consecutively. On appeal to the
Maryland Court of Appeals, the judg-
ment under Indictment No. 2901/1962
was reversed and the judgment under
Indictment No. 4612/1962 was affirmed
(Capparella v. State, 1964, 235 Md. 204,
201 A.2d 362).

At the time of petitioner's original conviction, Judge Grady committed him to Patuxent Institution for study and evaluation under the Maryland defective delinquent statute (Article 31B of the Annotated Code of Maryland). On September 14, 1964 he was found to be a defective delinquent by Chief Judge Michael J. Manley. Petitioner's application for leave to appeal from this determination was denied by the Maryland Court of Appeals (Capparella v. Director, Patuxent Institution, 1965, 239 Md. 713, 212 A.2d 500).

Petitioner, on March 5, 1965, filed a petition for the issuance of a writ of habeas corpus in the Baltimore City Court alleging that his original conviction under Indictment No. 4612/1962 had been improperly obtained. In a Memorandum, filed April 14, 1965, Judge James K. Cullen denied petitioner's application. Petitioner then filed a petition for a hearing under the Maryland Post Conviction Act (Article 27, section 645A et seq. of the Annotated Code of Maryland) contesting his original conviction under Indictment No. 4612/1962. Counsel was appointed to represent petitioner and after an evidentiary hearing, relief was denied by Judge Charles D. Harris in a Memorandum filed November 15, 1965. Apparently, petitioner did not apply for leave to appeal to the Maryland Court of Appeals from his adverse decision.

In this court, petitioner presented five allegations in support of his application for the issuance of a writ of habeas corpus. They are:

"I Their [sic] was an illegal search and seizure.

II The Police had no probable cause for the search and seizure.

III Petitioner was detained without being able to have the aid of counsel.

IV The Police did not identify themselves when they illegally arrested him on the street.

V Petitioner was denied 'due process of law.' "

Petitioner's second and fourth allegations are mere paraphrasings of his first contention. He maintains that he was a victim of an illegal arrest and a subsequent illegal search and seizure. Judge Grady, at the original trial, agreed with petitioner and ruled that the arrest was illegal and excluded from evidence a toy gun seized from petitioner at the time of the arrest. The Maryland Court of Appeals, likewise, held that the arrest was illegal and that the exclusion of the toy gun was proper. (Capparella v. State, 1964, 235 Md. 204, 207–208, 201 A.2d 362). Petitioner, however, further contends that since his arrest and detention were, in fact, illegal, *any* evidence obtained by the police authorities during the unlawful detention should have been excluded at the trial. Petitioner specifically alleges that following his illegal arrest he was placed in a police line-up and subsequently identified as the perpetrator of the crime for which he was later convicted. Petitioner urges that the identification in the line-up was a "fruit" of the illegal arrest and any testimony relating to such identification should have been excluded at his trial. Petitioner presented this argument to the Maryland Court of Appeals on his appeal from the original conviction. The Court of Appeals held that under the Maryland Rules of Procedure, if no objection was made at the trial, petitioner could not object for the first time on appeal. (Capparella v. State, 1964, 235 Md. 204, 209, 201 A.2d 362). Petitioner, before the Court of Appeals, further argued that his fingerprints [actually palm prints] obtained by the police after the illegal arrest, which fingerprints were found to be identical with fingerprints on the victim's car, were also a "fruit" of the illegal arrest and should not have been introduced into evidence. The Court of Appeals held, as on the issue of the line-up identification, that the point could not be raised for the first time on appeal. (Capparella v. State, 1964, 235 Md. 204, 209, 201 A.2d 362). The Court of Appeals further noted that "[I]t is not clear from the record wheth-

er the fingerprint identification was made from the fingerprints of the appellant taken after the arrest in question, or by a comparison with fingerprints available to the police from one of the appellant's earlier arrests." (Capparella v. State, 1964, 235 Md. 204, 207, 208, 201 A.2d 362, 364). When petitioner raised these same two issues, in his collateral attacks on his detention by way of a petition for a writ of habeas corpus and for post conviction relief, both Judge Cullen and Judge Harris felt that petitioner's allegations pertaining to the "fruits" of the illegal arrest should not be reconsidered as they had been previously passed on by the Maryland Court of Appeals.

The undersigned considered, however, that the Court of Appeals of Maryland had not ruled on the merits of these two contentions of petitioner. First, that Court did not decide whether testimony referring to the identification of the petitioner at a line-up following an illegal arrest would be inadmissible as fruit of the illegal arrest. There are cases excluding testimony of a witness about an earlier line-up identification but permitting identification of the defendant by the witness from the stand in open court (Gatlin v. United States, 1963, 117 U.S.App.D.C. 123, 326 F.2d 666; Payne v. United States, 1961, 111 U.S.App.D.C. 94, 294 F.2d 723). Secondly, the Court of Appeals of Maryland did not decide whether fingerprints of the accused taken after an illegal arrest would be inadmissible as fruit of an illegal arrest. There are cases holding such fingerprints inadmissible (Bynum v. United States, 1958, 104 U.S.App.D.C. 368, 262 F.2d 465) but permitting the introduction into evidence of fingerprints taken at a time other than when the accused was detained following an illegal arrest even though obtainable at another time only because the police knew the defendant's identity as a result of the inadmissible fingerprints taken following the illegal arrest (Bynum v. United States, 1960, 107 U.S.App.D.C. 109, 274 F.2d 767). Not only did the

Court of Appeals of Maryland fail to state whether or not it would follow the rationale of the Bynum cases but it noted that the record was not clear as to whether the fingerprints offered in evidence were in fact taken from the petitioner following his illegal arrest or had been obtained as the result of petitioner's earlier arrests (Capparella v. State, 1964, 235 Md. 204, 207–208, 201 A.2d 362). What the Court of Appeals of Maryland did hold was that, assuming without deciding that the line-up identification testimony and the fingerprint evidence were inadmissible, petitioner by his counsel's failure to object to the admissibility of such evidence at the time of his original trial was precluded from raising any such objection for the first time on appeal.

█ Petitioner in his instant petition to the Federal court raised the line-up identification testimony issue but did not expressly raise the fingerprint issue. Pro se habeas corpus petitions should be liberally construed particularly where the effect of a liberal construction is to avoid needless multiple piecemeal litigation of a petitioner's basic grounds of complaint. Accordingly, this court treated the instant petition as though petitioner had raised both issues previously presented by him to the Court of Appeals of Maryland and to Judges Cullen and Harris.

Some six months after the Court of Appeals of Maryland held that failure of petitioner's counsel to follow state procedural requirements barred further attack on the validity of his conviction and detention, the Supreme Court of the United States in a case factually quite similar to the instant one, held that a litigant's procedural defaults in state proceedings do not prevent vindication of his federal rights unless the State's insistence on compliance with its procedural rule serves a legitimate state interest; a question which the Supreme Court did not find it necessary to decide as the record in the Henry case indicated, although insufficiently, that Henry personally or through his counsel might

have knowingly foregone his opportunity to raise his federal claims (Henry v. Mississippi, 1965, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408). In the interests of sound judicial administration the Supreme Court remanded the case to the state courts to establish whether or not as a fact there had been a waiver.

The undersigned concluded that if the Maryland Courts followed those cases holding that testimony regarding line-up identification subsequent to an illegal arrest and evidence of fingerprints taken from an accused while in detention following an illegal arrest are inadmissible and if the state courts found as a fact that petitioner's fingerprints were so obtained, then petitioner has raised issues presenting serious constitutional questions. Although the Court of Appeals of Maryland ruled in 1964 that procedural defaults prevented petitioner from obtaining a ruling from the appellate court on these issues, it seemed to the undersigned to be open to question whether or not the Court of Appeals of Maryland in view of the Supreme Court decision in the Henry case would presently so rule without also considering the possibility of a waiver existing. In the instant case as in the Henry case the record, although insufficient, strongly suggested that there may have been a knowing waiver by the defendant of his federal claims. Petitioner Capparella was represented by counsel familiar with Maryland Rules of Procedure. The conviction was a post "Mapp" conviction so that the inadmissibility of evidence obtained as the result of an illegal arrest and illegal search and seizure was clearly and firmly established. Counsel objected to the admission of the evidence offered to sustain petitioner's conviction under Indictment No. 2901/1962 and on appeal was successful in having that conviction reversed. The state conceded that without this evidence a new trial would be futile. Counsel also objected to the admission of a toy gun offered to sustain petitioner's conviction under Indictment No. 4612/1962. The trial court suppressed this evidence and

was affirmed on appeal. Counsel's failure in view of these facts to object, as required by Maryland Rules of Procedure, to the admissibility of the line-up identification testimony and of the fingerprints might well have constituted a "deliberate choice of * * * strategy [that] would amount to a waiver binding on petitioner and would preclude him from a decision on the merits of his federal claim either in the state courts or" in the federal courts (Henry v. Mississippi, 1965, 379 U.S. 443, 451, 85 S.Ct. 564, 569, 13 L.Ed.2d 408).

Although the Courts of Maryland had considered the effect of the failure of petitioner's counsel to object at trial to the admission of the now challenged evidence from the standpoint of the effect of a failure to comply with a state procedural rule, the Maryland courts had not considered the failure to make timely objection from the standpoint of a knowing waiver. The undersigned considered this to be an issue which should be, and could be, developed factually in the state courts. The Maryland Court of Appeals, citing the Henry decision, had said that "recent Supreme Court decisions have discouraged the disposal of constitutional claims on the grounds of waiver by omission—such as failure to make an objection contemporaneously with an alleged error." (Farrell v. Warden, Maryland Penitentiary, December 20, 1965, 241 Md. 46, 49, 215 A.2d 218, 220). In Farrell, the Maryland Court of Appeals refused to accept a finding of waiver based merely on the petitioner's failure to object at his trial. The court, in remanding the case, directed the lower court to hold an evidentiary hearing on the petitioner's post conviction petition in order to ascertain if he knowingly waived his constitutional rights, supra. Thus the Maryland Court of Appeals appeared to hold that in a post conviction proceeding, the state court must afford petitioner an evidentiary hearing on the waiver issue and must make findings of fact as to whether the applicant willingly and knowingly waived his constitutional rights.

The undersigned accordingly held that as the State of Maryland apparently afforded an evidentiary hearing on the issue of waiver, the Henry decision taught that an initial determination of this issue by the state courts would "serve the causes of efficient administration of criminal justice, and of harmonious federal-state judicial relations." (Henry v. Mississippi, 1965, 379 U.S. 443, 452, 85 S.Ct. 564, 570, 13 L.Ed.2d 408). Accordingly, petitioner was instructed to file a petition for post conviction relief in the state courts again challenging the validity of his conviction and detention on the ground that evidence, i. e. testimony regarding line-up identification following an admittedly illegal arrest and fingerprints obtained during a detention following an admittedly illegal arrest (if the fingerprints were in fact so obtained), which was the fruit of an illegal arrest, was improperly admitted and formed the basis for his conviction and subsequent detention. The state would then have the opportunity to attempt to establish a waiver. In the event of a decision in the post conviction court adverse to the petitioner either on the merits or on procedural grounds, petitioner was instructed to apply to the Court of Appeals of Maryland for leave to appeal the lower court's decision. Failure to do so would be considered by this court to be a knowing relinquishment of the right thereafter to seek federal habeas corpus relief on the same grounds.

Petitioner, in his third allegation, contended that he was detained without the aid of counsel after his arrest. Obviously, petitioner sought to rely on the case of Escobedo v. Illinois, 1964, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, where the United States Supreme Court held that a denial of counsel at a certain stage of police investigation invalidated a confession obtained from a criminal defendant. Petitioner did not state any facts in support of his bare conclusional allegation. He did not claim that he was denied counsel. He did not claim he requested counsel. He did not even claim he wanted counsel. Moreover, petitioner made no confession or other incriminating statements during his detention. The Escobedo decision invalidates a conviction only if the criminal defendant was prejudiced by the denial of counsel following his arrest. Apparently, petitioner's sole contention in this connection was that since he was without counsel at the police line-up, any testimony that he had been identified at the line-up should have been excluded at the time of the trial. The Court of Appeals for the District of Columbia in 1965 rejected a similar argument characterizing it (in a concurring opinion) as a "Disneyland" contention, and held that Escobedo would not be applicable (Williams v. United States, 1965, 120 U.S. App.D.C. 244, 345 F.2d 733). This Court found the reasoning of that opinion and the concurring opinion highly persuasive and concluded that petitioner's third allegation was without merit. In view of the 1967 triumvirate of United States v. Wade, 1967, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149; Gilbert v. California, 1967, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178, and Stovall v. Denno, 1967, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 that conclusion, reached in 1966, will be re-examined hereinafter in this Memorandum Opinion and Order in that section of this opinion dealing with the court's second conclusion of law.

Petitioner's fifth allegation was a bald, conclusional assertion unsupported by any statement of fact. Although petitioner alluded to cases holding that a criminal conviction may not be obtained by the knowing use of false and perjured testimony, he did not suggest which, if any, of the testimony at his trial was false or perjured, or that the State had knowledge of any such alleged falsity, or perjury. Therefore, petitioner's fifth allegation was held to be without any merit.

Consequently, the petition for the issuance of a writ of habeas corpus was denied.

Following the instructions of this Court, petitioner filed a second petition for relief under the Maryland Uniform Post Conviction Procedure Act. The petition was denied by Byrnes, J., without the appointment of counsel and without a hearing on the grounds that Harris, J. had passed on the same allegations. Application for leave to appeal was denied by the Maryland Court of Special Appeals in a brief per curiam opinion not for publication and not officially reported.

Upon application thereafter by petitioner, his case seeking federal habeas corpus relief was reopened in this court and respondents were required to show cause why the writ of habeas corpus should not be issued as prayed. Respondents were requested to furnish the court with certain transcripts, and to advise the court "whether or not fingerprints were taken of petitioner subsequent to his arrest and if so what use was made of them."

The answer of respondents stated, inter alia, that palm prints taken from the petitioner and used for comparison were obtained after his arrest. It was from this comparison that Sergeant Padgett determined that the print on the vehicle and the one taken from the petitioner were identical. Respondents reasserted waiver as to the "fingerprint evidence" by failure to note a timely objection. The State did not expressly reassert waiver as to the line-up identification testimony but the record is clear that waiver either exists as to both the line-up testimony and the fingerprint evidence or as to neither.

Upon review of the petition, the Answer and Amendment to Answer to Show Cause Order, and of the transcripts of the original trial and of the first post conviction hearing, this Court directed that the case should be set down for an evidentiary hearing, specifically limited to:

1. The circumstances surrounding the obtention of and admission into evidence at petitioner's trial of petitioner's "fingerprints."

2. The circumstances surrounding the line-up identification of petitioner and the admission into evidence at petitioner's original trial of testimony relating thereto.

Counsel was appointed to represent petitioner in these proceedings.

At the evidentiary hearing it was stipulated that petitioner's trial counsel was physically unable to appear, but that if able, his testimony would have been that when he objected to the admissibility of certain evidence he intended his objection to relate to all evidence admitted to that point [which included the "line-up" identification and "fingerprint" testimony] ; that the failure to object specifically to the identification and fingerprint testimony was not "tactical", or an intentional waiver of the right to object thereto; but that he thought his various objections could be made by, and covered by, a general objection at the end of the State's case; and that he thought that his motion for a judgment of acquittal was the equivalent of the renewal of an objection.

While technically the taking of exceptions and the making of objections in the trial below leave much to be desired, and while the rule providing that an objection cannot be made for the first time on appeal would ordinarily seem properly to serve a legitimate state interest, the Court is unwilling on the whole record to find a voluntary waiver by petitioner. It therefore becomes necessary to consider (which the state courts have declined to do) whether the evidence in question would properly have been admitted over objection.

The petitioner testified at the federal habeas corpus hearing, as did Captain Kohler and Lieutenant Padgett. As might be expected, there is substantial conflict on many points. The Court will not undertake separately to summarize the testimony of each witness, but will make Findings of Fact and associated Conclusions of Law. In so doing the Court has considered the conduct and appearance of the witnesses on the stand; their method of testifying; the

presence or absence of contradiction; the interest in the outcome; the consistency or lack thereof with definitely established facts; and inherent probabilities or improbabilities.

1. Petitioner was picked up at about 12:30 p. m. on November 30, 1962 by then Lieutenant, now Captain Kohler of the Detective Bureau. Captain Kohler's attention was first attracted to the petitioner by the visible possession by petitioner of a gun which later proved to be a toy gun, but which at the time might reasonably have been assumed to be a real weapon and by certain furtive movements of the petitioner followed by a statement by the petitioner, when asked for information, that he was only "a burglar."

Because of the view that it takes of this case, this Court will not attempt and indeed finds it unnecessary to explore the legality of this arrest.

2. At the police station to which petitioner was taken immediately after his arrest at about 12:30 p. m., routine processing of petitioner was begun by the arresting officer, Lieutenant Kohler. Shortly thereafter Lieutenant Koenig, a detective assigned to the hold-up squad of the Police Department, was advised, as a matter of course, that petitioner had been seen by Lieutenant Kohler engaging in suspicious conduct. At the exact same time, and entirely independent of and separate from Lieutenant Kohler's activities, Lieutenant Koenig was investigating the robbery of one Lillian Stricker of 2812 Erdman Avenue, the offense for which petitioner was later tried and of which he was convicted. Mrs. Stricker had been robbed at gun point some eleven and one-half hours earlier as she sat in her automobile outside her home shortly after 1:00 a. m. on November 30, 1962. She had given Lieutenant Koenig descriptions of her two assailants, one of which descriptions accurately identified petitioner. (Transcript of original trial, page 41).

Shortly after the Stricker robbery, at approximately 1:20 a. m., two men had come to the door of a Miss Kane, who lived about one block from Mrs. Stricker. One of the men, of whom Miss Kane later gave a description which fitted the petitioner, asked for a drink of water. When this request was refused he wouldn't leave. "He just stood there grinning, and the thing that really got me and frightened me, I don't know, he just looked a little weird." (Transcript of original trial, page 73). This incident was not then reported to the police (Transcript of original trial, page 72) but as fate would have it, on the morning of November 30, Lieutenant Koenig to whom the investigation of the Stricker robbery had been assigned had occasion, while checking out an entirely unrelated robbery, to call Miss Kane. What transpired is best described in Miss Kane's own words:

"Q  Are you a neighbor of Mrs. Stricker?

A  I don't know. I had never seen her before.

Q  Did you call the police about the incident?

A  No, I didn't. I spoke with Lieutenant Koenig the following morning. We had a personal robbery at work, so I was talking to the Lieutenant about it, and he said, You know, I can't believe it, but the weirdest things happen. I told him what happened the night before, and he said, Hold on, I'm coming right over there and I want to talk to you about it; and when he did, I told him, and he asked me if I'd come to look at the line-up, or whatever you call it." (Transcript of original trial, pages 72–73).

Lieutenant Koenig was deceased at the time of the federal habeas corpus evidentiary hearing so that the Court did

not have the benefit of his testimony [1] but it is clear from the testimony of Miss Kane, given at the original trial, that by late morning or early afternoon of November 30, Lieutenant Koenig, knowing that the Stricker robbery, a felony, had been committed; having a description of the felons given by the victim; having a corroborating description of the felons given by Miss Kane, believed (and this court adds, with more than ample probable cause for such belief) that petitioner had committed the Stricker robbery. Accordingly, at the very least, from that time on petitioner's detention was completely authorized, valid and lawful.

3. Some six hours later at 6:07 p. m. Lieutenant Padgett, an admitted expert in the field of fingerprints and palm prints, was asked to compare "palm prints" of petitioner in connection with the Stricker complaint.

4. Some seven hours later at 7:30 p. m. a line-up was held in connection with the Stricker investigation.

Before the line-up, no force or duress had been exerted against petitioner, and no promises had been made to him, nor had he made any request for counsel. Petitioner was given his choice of position in the line-up, and chose position Number 3. Five others were in the line-up. Each was asked to say "Lady, give me your wallet."

The six in the line-up were as nearly similar in appearance as possible. Petitioner was identified by the victim, Mrs. Stricker, after speaking the words in question. After Mrs. Stricker had made her identification and had left the line-up room, Miss Kane was brought in separately. (Testimony of Lieutenant Kohler at federal habeas corpus hearing). She also positively identified the petitioner. (Testimony of Rita Kane, Transcript of original trial, page 71).

5. At approximately 11:08 p. m. Lieutenant Padgett received fingerprint and palm prints of petitioner. At approximately midnight, Padgett determined that the left palm print of petitioner corresponded with the palm print found on the Stricker automobile window.

From the totality of the record, the Court concludes as matters of law that:

■ 1. At the very least, by late morning or early afternoon of November 30 the detention of petitioner was not only justifiable but was completely authorized, valid and lawful on the basis of the reasonable belief of Lieutenant Koenig that a felony had been committed (factually indisputable) and that petitioner was probably the guilty person (factually established). The validity of such a detention is evidenced by Edwards v. State, 1950, 196 Md. 233, 236–237, 76 A.2d 132; see also: 5 Md.Law Rev. pp. 125, 158–159.

And Lieutenant Koenig's reasonable belief that a felony had been committed was in no way related to or the fruit of petitioner's original arrest, such belief being based on the information imparted to him by Mrs. Stricker shortly after the robbery and therefore prior to petitioner's arrest. Similarly Lieutenant Koenig's more than reasonable belief that petitioner was the felon was based upon a description given by Mrs. Stricker shortly after the robbery and prior to petitioner's arrest and corroborated by the description given by Miss Kane of a man involved in a "weird" occurrence, similar in modus operandi, taking place timewise and spacewise in remarkable propinquity to the Stricker robbery. Again, this information imparted to Lieutenant Koenig by Miss Kane came not as a result of petitioner's arrest nor was it obtained as a fruit of that arrest but was freely volunteered by Miss Kane when talking to Lieutenant Koenig in regard to an investigation by him of a totally unrelated robbery, Therefore, this Court concludes as a matter of law

___

1. The unavailability of Lieutenant Koenig at the federal habeas corpus hearing because of his death illustrates graphically the inherent vice and inequity of allowing collateral attacks on convictions without any conditions being set as to, or limitations upon, the timing of such attacks.

that there was no causal nexus, as that term has been defined by the Supreme Court of the United States in Wong Sun v. United States, 1963, 371 U.S. 471, 491–492, 83 S.Ct. 407, 9 L.Ed.2d 441, between petitioner's initial arrest and the information in Lieutenant Koenig's possession by late morning or early afternoon of November 30, which information and knowledge constituted ample probable cause for petitioner's subsequent detention.

■ 2. The subsequent treatment of petitioner was consistent thereafter with his constitutional rights. The line-up was reasonably, fairly and properly constituted. The specific rules first announced in United States v. Wade, 1967, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 and Gilbert v. California, 1967, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 relative to the right to presence of counsel were held in Stovall v. Denno, 1967, 388 U.S. 293, 296–301, 87 S.Ct. 1967, 18 L.Ed.2d 1199 not to have retroactive application and hence, under no circumstances, apply to petitioner's case. For all of the factual reasons heretofore outlined in this opinion petitioner was afforded all due process protections by the manner in which the line-up was conducted. (Cf. Palmer v. Peyton, 4 Cir. 1966, 359 F.2d 199). In passing it might also be noted that the reliability of the line-up identification is reinforced by the fact that both women saw the petitioner for a substantial, rather than a fleeting, period of time and in a brightly lighted area—Mrs. Stricker steadily for about three to five minutes under a big street light enabling her to see his face "clearly" and Miss Kane for fifteen continuous minutes under the glare of a light in the front of the house and a light at the top of the basement stairs. The line-up procedure followed in petitioner's case is not, as a matter of law, subject to attack or criticism.

3. Accordingly, it follows that the testimony given at the time of trial by both identifying witnesses as to their prior line-up identification was properly admissible as was their in-court identification.

■ 4. Testimony as to the use of palm prints, obtained in the course of processing after a lawful detention, and the prints themselves were properly admissible in evidence. (Schmerber v. California, 1966, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908), Davis v. Mississippi is clearly inapposite as there *"The State conceded that* the arrest on December 12 and *the ensuing detention through December 14* were based on neither a warrant nor *probable cause* and were therefore constitutionally invalid." (Davis v. Mississippi, 1969, 394 U.S. 721, 725, 89 S.Ct. 1394, 1396, 22 L.Ed.2d 676; emphasis supplied). In the instant case the State made no such concession but strongly urged that about six hours before the wheels were set in motion by Lieutenant Koenig to obtain palm prints from the petitioner the information upon which Lieutenant Koenig acted constituted probable cause for petitioner's "ensuing" detention. This Court has so found as a matter of law and has further found that the information imparted to Lieutenant Koenig had no causal nexus with the initial arrest of petitioner. Clearly, the Supreme Court in the Davis case envisaged such a factual situation arising by distinguishing between an initial arrest and ensuing detention; and in finding in the specific case then before it that probable cause existed *neither* for the initial arrest *nor* for the ensuing detention.

This Court does not believe that the original arrest, however characterized,[2]

---

2. It is interesting to note that when petitioner was first stopped for questioning by Lieutenant Kohler who had seen what appeared (and reasonably so) to him to be a real gun on petitioner's person and petitioner acting in a furtive manner, petitioner protested being stopped, stating that he wasn't a "hold-up man" but was a burglar—a distinction, without a difference as to illegality of conduct, that the officer apparently failed to appreciate. Certainly a statement of this nature was not one calculated to reassure a police officer.

"tainted" or invalidated the subsequent proceedings as to which probable cause existed. The Court does not believe that dryly ritualistic formalities require that after Lieutenant Koenig had reasonable grounds to believe that petitioner had been involved in a felony that petitioner must have been released, permitted to go to the sidewalk, and then be rearrested. Nor does the Court believe that even if it could possibly be contended that such should have been done, the line-up was invalid. This at the least was an effort to determine whether petitioner could reasonably be believed to be involved in the Stricker robbery. The identification at the line-up certainly constituted new and additional probable cause for petitioner's detention. The subsequent palm print identification was fully justified.

The Court accordingly finds that the petition for a writ of habeas corpus should be, and it accordingly is, denied.

The Court wishes to express its appreciation for the excellent representation of petitioner by Richard C. Whiteford, Esquire, court appointed counsel, with whose representation petitioner stated at the conclusion of the hearing he was fully satisfied.